UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| PRECISION AIRMOTIVE ) | |
| CORPORATION, et al., ) | |
| ) | |
|       *Movants* ) | |
| ) | |
| v. ) | No. 2:10-mc-244-JHR |
| ) | |
| RYAN INSURANCE SERVICES, INC., ) | |
| ) | |
|       *Respondent* ) | |
| ) | |

*ORDER ON MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS*

In accordance with my report and order of November 17, 2010, *see* Report and Order re: Discovery Dispute ("Report") (Docket No. 7), the parties have briefed the question of whether the respondent, Ryan Insurance Services, Inc. ("Ryan"), should be compelled to comply with two subpoenas served upon it by movants Precision Airmotive Corporation and Precision Airmotive, LLC (together, "Precision") in connection with an underlying Florida lawsuit, *see* Precision Airmotives' Motion To Require Ryan Insurance Services, Inc. To Comply With Subpoenas To Produce Documents ("Motion") (Docket No. 8) & attachments thereto; Ryan Insurance Services['] Memorandum in Opposition to Precision Airmotive's Motion To Comply With Subpoenas ("Opposition") (Docket No. 9) & attachments thereto; Precision Airmotive's Reply to Ryan Insurance Services' Opposition to Motion To Comply With Subpoenas ("Reply") (Docket No. 10).

As I had also ordered, *see* Report at 2, Ryan supplied a privilege log, *see* Appendix to Memorandum of Ryan Insurance Services, Inc. ("Privilege Log") (Docket No. 9-1).[1]

Precision seeks to compel compliance with both subpoenas on three alternative bases: that (i) Ryan waived any applicable privilege or protection by failing to produce a timely privilege log, (ii) the documents in question are not subject either to attorney-client privilege or work product protection, and (iii) to the extent that Ryan has shown the applicability of the work product doctrine, Precision has shown a compelling need for the withheld documents. *See* Motion at 6-10. For the reasons that follow, I decline to find an implied waiver but conclude that Ryan fails to meet its burden of demonstrating that the documents in question are subject to work product protection.[2] Accordingly, I grant the Motion and order that the documents with respect to which Ryan has claimed work product protection forthwith be provided to Precision.

## I. Applicable Legal Standards

Federal Rule of Civil Procedure 45 provides, in relevant part:

> A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
> (i) expressly make the claim; and
> (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

---

[1] Specifically, I ordered Ryan to attach an appendix to its memorandum (i) listing individual documents withheld on the basis of the attorney-client privilege, with notation of the author(s), recipient(s), and date(s) of each such document and a brief description of its subject matter, and (ii) providing additional detail concerning documents withheld on the basis of invocation of the work product doctrine, including the approximate number of documents in issue and the contents of the relevant claims files. *See* Report at 2.

[2] Although, in objecting to the subpoenas, Ryan invoked the attorney-client privilege and/or work product protection, *see* Objection to Subpoena To Produce Documents, Information, Etc. ("Objection/2009 Subpoena") (Docket No. 8-2), Exh. B to Motion; Response and Objection to Second Subpoena To Produce Documents, Information, Etc. ("Objection/2010 Subpoena"), Exh. 5 (contained in Docket No. 9-3) to Declaration of Phillip E. Johnson ("Johnson Decl.") (Docket No. 9-2), it now claims attorney-client privilege solely with respect to communications regarding the subpoenas themselves. *See* Privilege Log at 1-2. Insofar as appears, Precision does not seek those documents. *See* Reply. Thus, with respect to the disputed documents, only work product protection is now claimed. *See* Privilege Log at 3-6.

Fed. R. Civ. P. 45(d)(2)(A). If an objection is made, "[a]t any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection." Fed. R. Civ. P. 45(c)(2)(B)(i).

## II. Factual Background

On September 18, 2009, Precision served on Ryan a subpoena issued from this court in connection with the case of *Margaret North v. Precision Airmotive Corporation, et al.*, Civil Action No. 6:08-cv-2020-Orl-31 DAB ("*North*"), pending in the United States District Court for the Middle District of Florida. *See* Subpoena dated September 18, 2009 ("2009 Subpoena") (Docket No. 8-1), Exh. A to Motion.

The plaintiff in *North* is the widow of pilot Robert North, who died from injuries sustained in a plane crash in West Dover, Vermont, on December 2, 2006. *See* Complaint (Docket No. 2), *North*, ¶¶ 1, 13-14. She filed a survival and wrongful death suit in Florida state court against Precision and others on November 26, 2008, alleging, *inter alia*, that Precision designed, manufactured, or sold the fuel control system and replacement parts installed on the accident aircraft, that those items were defective, and that the defects proximately caused North's death. *See* Notice of Removal of Action Under 28 U.S.C. § 1441(b) (Diversity) ("Notice of Removal") (Docket No. 1), *North*, ¶ 2; *North* Complaint ¶¶ 67-70. On December 2, 2008, Precision removed the action to the United States District Court for the Middle District of Florida. *See* Notice of Removal. Precision denies liability, asserting that North proximately caused the accident by negligently attempting to land at the notoriously dangerous Mt. Snow Airport in extremely hazardous weather. *See* Motion at 2.

Ryan, which is not a party to the *North* suit, *see* ECF Docket, *North*, conducted two claims investigations for and on behalf of AIG Aviation, Inc. ("AIG"), now known as Chartis Insurance

Company ("Chartis"), involving the accident aircraft, a Piper Aerostar aircraft owned by SRQ, Inc. ("SRQ") and piloted by North, *see* Declaration of Allen A. Ryan ("Ryan Decl.") (Docket No. 9-4), attached to Opposition, ¶ 2. The first investigation related to a propeller strike incident that occurred on August 6, 2006. *See id.* ¶ 3. The pilot momentarily lost control of the aircraft during takeoff roll, and the aircraft veered left, destroying a runway light. *See id.* Allen Ryan, the president of Ryan, was assigned the claim on August 9, 2006. *See id.* At that time, there was not only a claim to be presented by SRQ against AIG for damage to the aircraft but there also was a potential claim against SRQ by the airport owner for destruction of the runway light, which AIG might have to defend and indemnify. *See id.* The second investigation related to the fatal accident on December 2, 2006. *See id.* ¶ 4. Allen Ryan was assigned this claim by AIG on December 3, 2006. *See id.*

The 2009 Subpoena requested documents pertaining to (i) North, (ii) the accident aircraft, (iii) insurance coverage provided by Ryan or any insurer to North or the accident aircraft, (iv) any investigation of the accident, (v) claims made as a result of the accident, and (vi) communications with the Wolk Law Firm (the plaintiff's counsel). *See* 2009 Subpoena. On October 7, 2009, Ryan objected, providing the following response to each request:

> Ryan objects to this request on the grounds that it seeks production of documents that are protected from discovery by the attorney-client privilege and/or the work product protection. Without waiving this objection, Ryan will produce copies of photographs in its possession. Information withheld consists of investigation reports and correspondence provided by Ryan to AIG Aviation and file notes and memoranda relating to same.

Objection/2009 Subpoena.

On November 16, 2009, Ryan's counsel, Phillip E. Johnson, conferred by telephone with Precision's counsel, Ashley Locke of Perkins Coie, concerning Precision's subpoena and Ryan's objections. *See* Johnson Decl. ¶ 4. Johnson agreed to arrange for digital copies of Ryan's

4

photographs to be sent to Locke. *See id*. Following the conference, Johnson received an email from Locke dated November 16, 2009, in which she asked Johnson to explain Ryan's privilege objections to communications with the Wolk Law Firm, stating: "I understand that reports and communications between AIG and Ryan are protected, but am not sure how it applies to the Wolk Law Firm communications." *See id*.; *see also* Email dated November 16, 2009, from Locke to Johnson, Exh. 1 (contained in Docket No. 9-3) to Johnson Decl.

On November 23, 2009, Johnson responded to an email from Locke of the same date, indicating that he intended to get back to her after Thanksgiving with answers to her questions and to send her a CD containing photographs. *See* Emails dated November 23, 2009, Exh. 1 to Johnson Decl. There were further email communications in December 2009 and January 2010 between Locke and Johnson concerning the status of the photo CD and the Wolk Law Firm communications. *See* Emails dated December 15, 2009, January 21, 2010, and February 5, 2010, Exh. 1 to Johnson Decl. On February 12, 2010, Locke emailed Johnson to confirm that she had received the photographs. *See* Email dated February 12, 2010, from Locke to Johnson, Exh. 1 to Johnson Decl. She did not mention the communications with the Wolk Law Firm. *See id*. Johnson never heard from Locke again and was under the impression that she had abandoned any effort to obtain copies of communications with the Wolk Law Firm and was not seeking further documents from Ryan. *See* Johnson Decl. ¶ 5.

In May 2010, Johnson was retained by Chartis with respect to a subpoena served upon it by Precision seeking Chartis's claim file relating to the fatal accident and the accident aircraft. *See id*. ¶ 6. On May 26, 2010, Johnson received a copy of the Chartis claims file relating to the fatal accident. *See id*. ¶ 7. On May 28, 2010, he spoke by telephone with John Devaney, counsel for

Precision, regarding the subpoena and Chartis's objection to producing its file. *See id.* ¶ 8. Johnson told Devaney that he would review the file and provide him with categories of information contained in the file. *See id.* The same day, Johnson had a follow-up telephone conversation with Devaney in which he described 17 categories of information contained in the file, including "Ryan Insurance reports, bills and correspondence[,]" "internal Chartis documents regarding administrative matters[,]" "Chartis claim-related documents[,]" and "faxes to and from the Wolk Law Firm that included . . . attendance sheets for inspections[.]" *Id.*

On June 3, 2010, Precision served a second subpoena on Ryan in connection with the North case. *See* Subpoena dated June 3, 2010 ("2010 Subpoena") (Docket No. 8-4), Exh. D to Motion. The 2010 Subpoena sought documents relating to the fatal accident as well as several prior accidents in which North and/or his aircraft were involved. *See id.* On June 10, 2010, Ryan responded that it had no documents relating to any of the listed accidents apart from the August 6, 2006, incident and the fatal crash on December 2, 2006. *See* Objection/2010 Subpoena. With respect to documents relating to those two incidents and to the accident aircraft, it agreed to produce photographs but otherwise interposed an objection based on the attorney-client privilege and work product doctrine, stating: "Information withheld consists of investigation reports and correspondence provided by Ryan to AIG (now known as Chartis) and file notes and memoranda relating to same, all of which constitute a claim file made for and on behalf of AIG (Chartis)." *Id.*

On June 11, 2010, Johnson emailed Devaney, stating that (i) he had a copy of Ryan's file relating to the fatal accident, with respect to which he had dealt with Locke in connection with the earlier subpoena and had produced only copies of photographs, (ii) he was happy to discuss that file further with Devaney, (iii) much of that file was duplicative of the Chartis file that he had discussed

with Devaney the prior week, and (iv) when he received a copy of Ryan's file relating to the second incident, he would call Devaney and describe for him generally what was in both files, and they could discuss production/privilege issues. *See* Email dated June 11, 2010, from Johnson to Devaney, Exh. 4 (contained in Docket No. 9-3) to Johnson Decl. Devaney responded by email the same day, stating that he looked forward to attempting to work through the production issues and that Precision would "almost certainly" file motions to enforce the Chartis and Ryan subpoenas if the companies withheld documents relating to claims and investigations arising from aviation accidents involving North. *See* Email dated June 11, 2010, from Devaney to Johnson, Exh. 4 to Johnson Decl.

Johnson had no further communications with Devaney about the subpoena until August 4, 2010, when Devaney called him for a "meet and confer." *See* Johnson Decl. ¶ 13. Johnson confirmed that Ryan still objected to producing its claims file. *See id*. Devaney informed Johnson that he would be filing a motion to compel. *See id*. Devaney never requested any privilege log beyond what had been provided in Ryan's objection to the subpoena, as supplemented by the conversation concerning the contents of the subpoenaed Chartis file. *See id*. Devaney never suggested to Johnson that waiver of privilege might be an issue in the discovery dispute. *See id*. Johnson heard nothing further from Devaney until he was notified that Devaney had sought this court's intervention through his November 8, 2010, motion for a discovery conference. *See id.* ¶ 14.

Following the grant of an extension, the discovery deadline in *North* expired on July 30, 2010. *See* Docket Nos. 88-89, *North*. A jury trial, originally set for January 31, 2011, was rescheduled by order dated December 2, 2010, to April 18, 2011. *See* Joint Motion To Adjust Trial Date and Pretrial Deadlines (Docket No. 150), *North*; Order and Amended Scheduling Order (Docket No. 154), *North*.

7

## III. Discussion

### A. Waiver of Work Product Protection

As a threshold matter, Precision seeks to compel production of the withheld documents on the ground that Ryan failed to timely produce a privilege log, effectuating a waiver of any claimed privilege or work product protection. *See* Motion at 6-7. Ryan rejoins that (i) Federal Rule of Civil Procedure 45(d)(2) provides no guidance as to when a privilege log must be provided, (ii) none of the cases on which Precision relies suggest that such a log must be provided prior to the time a court must rule on privilege issues, (iii) Ryan informed Precision of the contents of the file pertaining to the fatal accident in connection with the Chartis subpoena, and (iv) any delay in the creation of a more detailed privilege log was Precision's fault for waiting so long to file its motion. *See* Opposition at 8-10.

"[T]he party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and that it has not been waived." *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003). However, "courts should be cautious about finding implied waivers." *Id*. at 23. "Claims of implied waiver must be evaluated in light of principles of logic and fairness." *Id*. Prior dealings between the parties are among factors that bear on whether a finding of implied waiver is appropriate. *See, e.g., In re Dep't of Justice Subpoenas to ABC*, 263 F.R.D. 66, 69-71 (D. Mass. 2009) (holding that magistrate judge properly declined to impose *per se* waiver for six-month delay in producing privilege logs in response to subpoena; observing that "[w]aiver should only be found in the absence of mitigating considerations that favor the subpoenaed party" and that "[h]ere, one major mitigating factor is the prior dealings of the parties, which show that a delay in the creation of privilege log [] was not anomalous, but rather

had already occurred at least thirty times without objection by the government during the investigation") (citation and internal quotation marks omitted).

Rule 45(c)(2)(B) provides that an objection to a subpoena to produce materials or permit inspection "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(c)(2)(B). Rule 45(d)(2)(A) states: "A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must . . . (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(d)(2)(A).

"The operative language is mandatory and, although [Rule 45] does not spell out the sufficiency [of the description of withheld documents] requirement in detail, courts consistently have held that the rule requires a party resisting disclosure to produce a document index or privilege log." *In re Grand Jury Subpoena*, 274 F.3d 563, 575 (1st Cir. 2001). "A party that fails to submit a privilege log is deemed to waive the underlying privilege claim." *Id*. at 576. "Although most of the reported cases arise in the context of a claim of attorney-client privilege, the 'specify or waive' rule applies equally in the context of claims of work product privilege." *Id*.

Ryan cites *Tuite v. Henry*, 98 F.3d 1411, 1416 (D.C. Cir. 1996), for the proposition that, pursuant to Rule 45, a party need not supply a privilege log at the same time as it interposes an objection to a subpoena. *See* Opposition at 8-9; *Tuite*, 98 F.3d at 1416. It further argues that no caselaw cited by Precision indicates that a privilege log must be supplied prior to such time as a court must adjudicate any privilege-related dispute. *See* Opposition at 9-10. Nonetheless, as Precision rejoins, *see* Reply at 6, even *Tuite* indicates that a privilege log must be supplied "within a

9

*reasonable time*, such that the claiming party has adequate opportunity to evaluate fully the subpoenaed documents and the requesting party has ample opportunity to contest that claim[,]" *Tuite*, 98 F.3d at 1416 (emphasis in original).

Ryan failed to supply an adequate privilege log within a reasonable period of time in response to either the 2009 or the 2010 subpoena. Neither the generalized description of the withheld documents in its objections to those subpoenas nor the slightly more detailed recitation of categories transmitted by telephone to Devaney in connection with the Chartis subpoena sufficed. As Precision points out, *see* Reply at 5-6, even the description of the Chartis file lacked any reference to the dates of creation of those documents, the author(s), the recipient(s), or any identification of the numbers or precise nature of the individual documents comprising the groups. Such a "log" plainly is inadequate. *See, e.g., Bozeman v. Chartis Cas. Co.*, No. 2:10-cv-102-FtM-36SPC, 2010 WL 4386826, at *3-*4 (M.D. Fla. Oct. 29, 2010) ("Typically, the privilege log will identify each document and the individuals who were parties to the communications with sufficient detail to permit the compelling party or court to determine if the privilege is properly claimed[;]" a proper privilege log should contain the name and job title or capacity of the author and each recipient; the date on which the document was prepared and, if different, the date on which it was sent to or shared with others; the title and description of the document; the subject matter addressed; the purpose for which it was prepared or communicated; and the specific basis for the claim of privilege).

Ryan supplied no privilege log until November 29, 2010, in response to my order that it do so. *See* Report at 2; Privilege Log.[3] It cites no authority for the proposition that a delay of

---

[3] I ordered the creation of that log without prejudice to Precision's argument that the non-existence of the log waived the privilege. *See* citation. In its log, Ryan mistakenly identifies the year of the initial five communications between itself
*(continued on next page)*

approximately 13 months (as in the case of the 2009 Subpoena), or even five months (as in the case of the 2010 Subpoena), from the filing of an objection to the provision of a privilege log is reasonable, and I find that it is not.

Nonetheless, I decline to find a waiver of work product protection of the withheld documents in the circumstances presented. Although Precision promptly communicated with Ryan concerning its objections to both the 2009 and 2010 subpoenas, Precision never requested a privilege log or enlisted the aid of the court in compelling production of the withheld documents until November 2010, more than a year after Ryan responded to the 2009 Subpoena, five months after it responded to the 2010 Subpoena, and approximately four months after the expiration of the discovery deadline in the underlying case. Indeed, Locke, on behalf of Precision, stated that she understood that Ryan's communications with AIG were protected. To the extent that Precision contends that Ryan denied it the ability to make a timely assessment of Ryan's claims of attorney-client privilege and work product protection and that it now is prejudiced in the absence of such information on the eve of trial, *see* Motion at 7, Precision itself failed to take timely steps to remedy the problem and obviate any resulting prejudice. A finding of implied waiver in these circumstances is unwarranted.

### B. Applicability of Work Product Protection

Work product protection extends "to documents and other tangible things that are prepared in anticipation of litigation or for trial." *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 27 (1st Cir. 2009) (citation and internal quotation marks omitted). "It is not enough to trigger work

---

and AIG relating to the fatal accident as 2007 rather than 2006. *Compare* Ryan Decl. ¶ (AIG assigned claim to Ryan on December 3, 2006) *with* Privilege Log at 5 (describing, in Items 2(v) through (z), communications between 12/04/07 and 12/20/07).

product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated." *Id*. at 29 (emphasis in original). "It is only work done in anticipation of or for trial that is protected." *Id*. at 30. "Even if prepared by lawyers and reflecting legal thinking, "materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by [work product protection]." *Id*. (citation and internal punctuation omitted). *See also, e.g., American Home Assurance Co. v. United States*, Civil Action No. 09-cv-258 (DMC), 2009 WL 3245445, at *1 (D.N.J. Oct. 7, 2009) ("Documents created in the ordinary course of business that prove useful in future litigation are not protected by the work-product doctrine."). Materials need not be prepared by or for an attorney to qualify for protection; they can so qualify if prepared by or for, *inter alia*, a party's insurer or agents of the insurer. *See, e.g., United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988).

"[F]ederal courts apply federal law when addressing the work product doctrine, even in diversity cases lacking any federal question." *S.D. Warren Co. v. Eastern Elec. Corp*., 201 F.R.D. 280, 282 (D. Me. 2001). In this district, the analytical framework for application of the work product doctrine to an insurance file is set forth in *Warren*, in which Magistrate Judge Kravchuk declined to follow the minority federal approach, adopted by the Law Court in *Harriman v. Maddocks*, 518 A.2d 1027 (Me. 1986), of deeming all materials in an insurance claims adjuster's files to have been collected or created in anticipation of litigation because it is in the nature of the insurance business to always be preparing for litigation. *See Warren*, 201 F.R.D. at 283. Instead, Magistrate Judge Kravchuk followed the approach of "[t]he overwhelming majority of federal courts[,]" which had "chosen not to accord insurance companies special treatment during discovery and [had] maintained

the fact specific approach in this context." *Id*. (footnote omitted). She elaborated:

> Although a court cannot and should not resolve the merits of an insurance claim at the discovery stage, certainly it is capable of assessing whether the prospect of litigation was the primary reason or motivation for the preparation of the materials . . . . [T]he better rule is to hold that unless and until an insurance company can demonstrate that it reasonably considered a claim to be more likely than not headed for litigation, the natural inference is that the documents in its claims file that predate this realization were prepared in the ordinary course of business, i.e., the business of providing insurance coverage to insureds. This approach realistically recognizes that at some point an insurance company shifts its activity from the ordinary course of business to anticipation of litigation, and no hard and fast rule governs when this change occurs.

*Id*. at 285 (citations and internal quotation marks omitted).

As this language suggests, the insurer bears the burden of demonstrating that work product protection applies, *see, e.g., In re Veiga*, Nos. 10-370(CKK)(DAR), 10-371(CKK)(DAR), 2010 WL 4340564, at *4 (D.D.C. Nov. 3, 2010), *appeal dismissed*, No. 10-7146, 2010 WL 5140467 (D.C. Cir. Dec. 17, 2010), and must do so by showing not only that, at the time of the creation of the document or item in question, it subjectively anticipated litigation, but also that its subjective belief was objectively reasonable, *see, e.g., In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) ("For a document to meet this standard, the lawyer [or, in this case, insurance representative] must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable.").[4]

---

[4] I decline Ryan's request, *see* Opposition at 7, to follow the *Harriman* (minority federal) rather than the *Warren* approach to analysis of application of the work product protection to insurance files. Ryan offers no basis, let alone a compelling one, to depart from the precedent set forth in the well-reasoned *Warren* case. To the extent that Ryan suggests that the *Warren* approach differs materially from that taken by the United States Court of Appeals for the District of Columbia Circuit in *Sealed Case*, *see id.*, I disagree. I perceive little difference between framing the question as whether an insurer reasonably considered a claim "more likely than not headed for litigation," *Warren*, 201 F.R.D. at 285, and framing it as whether the insurer reasonably considered litigation "a real possibility," *Sealed Case*, 146 F.3d at 884. However, to the extent that there may be a difference, I have relied on the *Warren* formulation of the test.

13

"In discharging its burden, the proponent [of an asserted privilege] must adduce competent evidence in support of its claims." *Veiga*, 2010 WL 4340564, at *4. "Consistent with these strictures, the proponent of the privilege must offer more than just conclusory statements, generalized assertions, and unsworn averments of its counsel." *Id*. "Where the proponent fails to adduce sufficient facts to permit the court to conclude with reasonable certainty that the privilege applies, its burden is not met." *Id*. *See also, e.g., Weber v. Paduano*, No. 02 Civ. 3392(GEL), 2003 WL 161340, at *4 (S.D.N.Y. Jan. 22, 2003) ("A party withholding insurance documents may not rest on conclusory allegations of privilege, but must establish, by objective evidence, that the author of the document anticipated litigation at the time that the document was created, and would not have created the document in essentially the same way had the prospect of litigation not existed.").

### 1. Propeller Strike Incident, August 6, 2006

With respect to its claims file pertaining to the propeller strike incident in August 6, 2006, Ryan falls short even of meeting the first prong of the applicable test: that it subjectively anticipated that litigation was more likely than not to occur. Allen Ryan, who was assigned the claim on August 9, 2006, states:

> At the time, there was not only a claim to be presented by SRQ against AIG Aviation for damage to the aircraft, but there was a potential claim against SRQ by the airport owner for destruction of the runway light, which AIG Aviation may have had to defend and indemnify. While I cannot say that I thought at that time that litigation was likely with respect to either claim, based on my experience, litigation or threatened litigation is quite common in aviation matters. There are far more liability and coverage issues that can arise that are not found in other accident situations such as those involving automobiles. No litigation arose out of this incident.

Ryan Decl. ¶ 3.

In so stating, Allen Ryan essentially concedes that he did not harbor a specific fact-based reason to believe that it was more likely than not that litigation would ensue from the August 6,

14

2006, incident. Ryan accordingly fails to meet its burden of demonstrating that the claims file related to this incident is covered by work product protection.

### 2. Fatal Crash, December 2, 2006

With respect to Ryan's claims file pertaining to the fatal crash, Allen Ryan states:

> The second investigation [by Ryan on behalf of AIG] related to the fatal accident in which Mr. North was involved with the aircraft on December 2, 2006. I was assigned this claim by AIG Aviation on December 3, 2006. From the beginning, I believed that this incident was more likely than not, in fact highly likely, to result in litigation and the work I performed was in anticipation of that litigation. AIG Aviation maintains an interest in the litigation because of its subrogation claim arising out of the destruction of the aircraft for which AIG Aviation paid. That subrogation claim has been the primary reason AIG Aviation has kept me involved in the case, including but not limited to attendance at four or five inspections of the aircraft. I maintain a claims file regarding my work on this matter that includes report letters to AIG Aviation on various issues, many of which contain my mental impressions on matters.

Ryan Decl. ¶ 4.

In so stating, Ryan demonstrates that, from the inception of the claim relating to the fatal crash, it harbored a subjective belief that litigation more likely than not would ensue. Yet, Allen Ryan identifies only one basis for that belief: AIG's potential subrogation claim. *See id*. He offers no detail concerning the point at which he *reasonably* anticipated a subrogation claim – for example, the point at which he had a factual basis to believe that Precision or any other party, as opposed to pilot error and/or weather conditions, played a role in causing the fatal crash, or that AIG expressly directed him to investigate its subrogation interests. *See id*.

Nor, perhaps because Ryan takes the position that the entirety of the file is protected, does it attempt to argue that any descriptions within its privilege log signal that individual items were prepared in anticipation of litigation rather than having been prepared in the course of the business of claims investigation and handling. *See* Opposition at 5-8; Privilege Log at 4-6; *see also, e.g.,*

15

*American Home*, 2009 WL 3245445, at *2 ("It is routine for an insurance company to send an agent or investigator to the scene of an accident to gather information and prepare a report. It is well-settled that reports generated in the course of general investigations, even if litigation is arguably anticipated, are not entitled to work-product protection.").[5]

To the extent that Ryan claims work product protection as to communications between either itself or AIG and the plaintiff's counsel, it offers nothing more than a conclusory argument that these communications are protected "because of the community of interests between North and AIG as insured and insurer and because AIG stands in the shoes of the insured on its subrogation claim."

---

[5] In any event, with few exceptions, the Privilege Log fails to demonstrate that application of work product protection is appropriate. Ryan identifies 20 categories of documents, 18 by general description and two with reference to individual documents: (i) communications between Ryan and AIG and (ii) communications between the Wolk Law Firm and Ryan and/or AIG. *See* Privilege Log at 4-6. Certain of the categories appear on their face not to have been prepared in anticipation of litigation, such as "[v]arious expense receipts and invoices[,]" "Ryan itemized invoices to AIG[,]" "[a]ircraft data plates and engine data plates[,]" "[f]uneral bill," "Aircraft Insurance Summary Page[,]" and "[v]arious business cards." *Id*. at 5-6. Other categories are insufficiently described to enable the court to discern whether they were prepared in the ordinary course of business or in anticipation of litigation, such as "[m]iscellaneous notes made by Ryan at various times throughout his handling of claim." *Id*. at 5. Communications with the plaintiff's counsel, which span the period from February 5, 2007, approximately two months after the accident, to June 21, 2007, are described as concerning inspection of the wreckage, *see id*. at 5-6, conveying the impression that they were prepared in the ordinary course of Ryan's and AIG's business, *see, e.g., Lamar Adver. of S.D., Inc. v. Kay*, 267 F.R.D. 568, 578 (D.S.D. 2010) ("An insurer assembles a claims file any time there is an accident involving one of its insureds, and the fact that an accident merely occurs or that an attorney later becomes involved in the insurer's ordinary course of business does not protect documents or activities from discovery. To the extent the information in [the insurer's] file was created during factual investigation of the claim, the documents are not privileged."); *American Home*, 2009 WL 3245445, at *3 ("[S]imple involvement of counsel in an insurer's claim investigation does not transform the investigation to one undertaken in anticipation of litigation."). Similarly, nearly all listed communications between Ryan and AIG, which span the period from December 4, 2006, two days after the accident, to June 23, 2008, approximately five months prior to the filing of the underlying suit, *see* Privilege Log at 4-5, are described as concerning investigation and/or inspection and cannot be discerned to have been prepared in anticipation of litigation. Ryan does describe an email to AIG dated May 8, 2007, regarding, *inter alia*, "subrogation claim of AIG[,]" and two further communications that arguably touch on litigation, a letter to AIG dated December 10, 2007, regarding "facts, status and impressions[,]" and a fax to AIG dated January 31, 2008, regarding "status and advice on course of action." Privilege Log at 4. However, even if there is sufficient description to infer that these communications were made in anticipation of litigation, I decline to permit Ryan to withhold them. I afforded Ryan a chance to create a belated privilege log and to argue its position. It did not avail itself of the opportunity to argue that specific privilege log descriptions counseled in favor of work product protection and instead elected to argue that the entirety of the file is protected.

Opposition at 8.  As Precision points out, *see* Reply at 4, Ryan neither adduces evidence nor cites legal authority for that proposition, thereby failing to meet its burden of demonstrating the applicability of work product protection as to those communications.

Ryan falls short of demonstrating that the claims file related to the fatal crash, or any part of that file, is covered by work product protection.

For the foregoing reasons, Precision's motion to compel compliance with the 2009 and 2010 subpoenas is ***GRANTED***, and Ryan is ***ORDERED*** to produce forthwith to Precision the approximately 65 documents within its claims file concerning the August 6, 2006, incident, and the approximately 400 documents within its claims file concerning the fatal December 2, 2006, incident, that it has withheld on the basis of the invocation of work product protection.

***SO ORDERED***.

### ***NOTICE***

***In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.***

***Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to appeal the district court's order.***

Dated this 17th day of January, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge